# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 1548 | **DATE** | 7/6/2004 |
| **CASE TITLE** | Michael A. Dewick, Sr., et al vs. Maytag Corp., et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due__ ___.

(4) ☐ Ruling/Hearing on __ ___ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on ____ _ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for ____ _ at ____ ___.

(7) ☐ Trial[set for/re-set for] on _____ at _____ .

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order.  This opinion has granted Maytag's motion 1 in part and denied it in part, (57-1) denied motions 2 and 6 (58-1, 62-1) and granted motion 7 (63-1) for the limited purpose it seeks to advance.  Counsel for the parties are directed to transmit letters to this Court on or before July 20, 2004, with copies to opposing counsel, identifying their respective unavailabilities for trial between August 16 and November 30, 2004.  This Court will then set the case for trial.

(11) ■  [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | | **JUL 0 7 2004** | |
| | Notified counsel by telephone. | | | date docketed | |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | 7/6/2004 | |
| | | | | date mailed notice | |
| SN | courtroom deputy's initials | | | SN | |
| | | | | mailing deputy initials | |

U.S. DISTRICT COURT
CLERK

2004 JUL -6 PM 3:03

Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL A. DEWICK, SR., et al., )
etc., )
)
Plaintiffs, )
)
v. ) No. 03 C 1548
)
MAYTAG CORPORATION, et al., )
)
Defendants. )

## MEMORANDUM OPINION AND ORDER

Michael Dewick Sr. and Holly Dewick (collectively

"Dewicks"), as parents of and next of kin to minor Michael Dewick

Jr. ("Michael"[1]), have filed a products liability action against

Maytag Corporation ("Maytag"), stemming from an incident in which

Michael climbed inside the broiler compartment of a kitchen range

manufactured by Maytag when he was 10 months old.  In

anticipation of the forthcoming trial, Maytag filed 12 motions in

limine to exclude various categories of evidence.[2]  After Motion

9 was granted by agreement, Motions 3-5, 8 and 10-12 were dealt

with in this Court's June 4, 2004 memorandum opinion and order

("June 4 Opinion").  This memorandum opinion and order now deals

---

[1]  This omission of "Jr." should create no confusion,
because Michael Sr. is not referred to separately anywhere in
this opinion.

[2]  In a reversal of the normal sequence, those motions were
filed in advance of the parties' joint submission of a proposed
final pretrial order, which came in mid-June and was entered by
this Court on June 21, 2004.

with Maytag's remaining motions.[3]

Pursuant to Fed. R. Evid. ("Rule") 702, Dewicks offer the opinion testimony of Jack E. Hyde ("Hyde"). For Hyde's testimony to be admissible under Rule 702, it must satisfy the two-part test first set out in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) and later extended to fields of nonscientific expertise in Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999). As reflected both in Kumho and in the essentially contemporaneous amendment to Rule 702 with its accompanying Committee Note,[4] they eliminated any then-existing question as to whether the district courts' gatekeeping function applied to all expert testimony, not

---

[3] All citations to Maytag's motions, which include statements in their support, will take the form "M. Motion __:__," with the number preceding the colon conforming to Maytag's motion numbering and the number following the colon indicating the page of the motion statement. That same usage extends to Maytag's memorandum (cited "M. Mem.") in support of its Motion 1, to Dewicks' submissions (cited "D. Resp.") and to Maytag's reply (cited "M. R. Mem.").

[4] As a then member of the Judicial Conference's Advisory Committee on the Rules of Evidence, this Court chaired the subcommittee in charge of drafting the proposed amendments to Rules 701, 702 and 703. In an instance of particular serendipity, the resulting work product had been approved by the Advisory Committee and Standing Committee and was out for public comment just at the time when Kumho came before the Supreme Court--and that Court cited the Committee Note approvingly in the course of its opinion (526 U.S. at 156-57). As a result, the Committee Note was in turn revised to reflect the Kumho decision, and the final product then cleared the Standing Committee, the Judicial Conference and the Supreme Court so as to become effective December 1, 2000.

just testimony based on science.

In brief, that previously-debated question was answered with an unconditional "yes." And that made it irrelevant which of the various sources of expertise listed in Rule 702 informed a designated expert's opinions, although the standards for testing the opinion may differ. For example, on the one hand most disciplines do not implicate peer review, which Daubert, 509 U.S. at 593 had specified as one relevant standard in the area of "scientific" knowledge, while on the other hand aspects of the scientific method may well be employed (or indeed required) to reach valid opinions in fields not labeled as demanding "scientific" knowledge.[5]

What remains as the common core for any Rule 702 opinion

---

[5] Any reference to Kumho is conspicuously absent from Maytag's submissions. Maytag's sole focus on the Daubert standards skews the analysis, for as Kumho, 526 U.S. at 150-51 stressed:

The conclusion, in our view, is that we can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in Daubert, nor can we now do so for subsets of cases categorized by category of expert or by kind of evidence. Too much depends upon the particular circumstances of the particular case at issue.

Daubert itself is not to the contrary. It made clear that its list of factors was meant to be helpful, not definitive. Indeed, those factors do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged.

under <u>Daubert</u>-<u>Kumho</u> is that the opinion be both reliable and relevant (<u>Daubert</u>, 509 U.S. at 590-91, 597; <u>Smith v. Ford Motor Co.</u>, 215 F.3d 713, 718 (7th Cir. 2000)). And whatever pigeonhole Hyde might be considered as occupying for purposes of various aspects of his proffered opinion, this opinion would of course necessarily look to those dual requirements. But because Motion 1 (other than a brief passage at M. R. Mem. 1:7-8) challenges the admissibility of Hyde's opinions solely on reliability grounds, this opinion needs to discuss only that branch of the analysis.

As to that reliability prong, our Court of Appeals uses two evaluative criteria: "whether the expert is qualified in the relevant field and whether the methodology underlying the expert's conclusions is reliable" (<u>Masters v. Hesston Corp.</u>, 291 F.3d 985, 991 (7th Cir. 2002)). Those criteria are examined here in turn.

As to Hyde's qualifications, Rule 702 permits an expert to be qualified through "knowledge, skill, experience, training or education." That proposition is really a two-sided coin--abstract academic credentials (no matter how impressive) should not be overvalued if not apropos to the zone of expertise required, while at the same time relevant practical experience should not be undervalued if pertinent (<u>Smith</u>, 215 F.3d at 718).

Hyde's resume provides a snapshot of some of his relevant

4

qualifications. He holds a college degree in Safety and Fire Protection Engineering Technology, has supplementary certifications as a product safety professional and specialist and is a member of several professional organizations devoted to product safety, safety engineering and safety testing. Most significantly, Hyde has worked for over a quarter century in the product safety arena. Much of his professional experience involves evaluating product safety from an accident prevention standpoint. During his time as a safety and fire consultant about half of Hyde's time was spent analyzing products for accident prevention (Hyde Dep. 23-24). And in his 11 years as a product and safety engineer Hyde evaluated a whole slew of products (including fans, heating equipment, humidifiers and vacuum cleaners) with an eye towards safety concerns (Hyde Dep. 25-26)--and for present purposes, one key component of his safety analysis included determining whether the products posed accident risks to children less than a year old (Hyde Dep. 26-28).

Maytag's contention (M. Mem. 1:16, M. R. Mem. 1:1-3) that, because Hyde has never previously analyzed the specific safety issue of how a 10 month old infant interacts with a broiler door, he is somehow unqualified to render an opinion here takes far too restrictive a view of what Rule 702 calls for as to the scope of a witness' expertise. Indeed, it is extraordinarily ironic for Maytag to urge that the issue be whittled down to the narrow

question of the safety of a 10 month old in relation to broiler doors, given its emphasis on the paucity of similar occurrences when it comes to arguing foreseeability or unforeseeability. Instead a far more realistic approach is to construe the general subject for consideration as "child safety in relation to household appliances." And under that rubric both Hyde's academic training and his practical experience clearly provide abundant qualification for his rendering of an opinion.

But the basic determination that Hyde is qualified to give an expert opinion here is not enough:  For such an opinion to be admissible, it must also satisfy the independent requirement of reliability based on the methodology used to reach his conclusions (Bourelle v. Crown Equip. Corp., 220 F.3d 532, 537 n.11 (7th Cir. 2000)).  Because the crediting or discrediting of Hyde's conclusions poses a factual issue to be considered at trial, the Daubert-Kumho assessment of his opinions' reliability must focus exclusively on that methodology and not on his ultimate conclusions (Chapman v. Maytag Corp., 297 F.3d 682, 687 (7th Cir. 2002); Smith, 215 F.3d at 718).  And to that end the most significant reliability factor is whether a particular proposed expert (whether or not classified as a "scientist" as such) has used the scientific method to arrive at his or her conclusions and opinions (Chapman, 297 F.3d at 688).

Hyde has testified that he did use the scientific method in

6

conducting his research and formulating his opinions (Hyde Dep. 65). But this Court would shirk its gatekeeper role if it were to accept that conclusory declaration without examining whether Hyde's actions really comport with the standard of reliability envisioned by the scientific method requirement (see Kumho, 526 U.S. at 141; Smith, 215 F.3d at 719).

Hyde's Report ("Rep.") 16-19 and his corresponding deposition indicate that he is prepared to offer opinions about a wide range[6] of subjects, including (1) whether the design of the range that was involved in Michael's accident made it "defective, unreasonably dangerous, and not reasonably safe for its intended and foreseeable uses," (2) whether the warnings that accompanied the range were adequate and (3) whether alternative designs and warnings could have made the range safer. Each of those subjects calls for separate scrutiny.

To develop all of his opinions Hyde first conducted several force tests on the Maytag range (Hyde Rep. 10-11). Relatedly he also gathered anthropometric data for infants the same age as Michael and used that information to determine that a broiler door with a recessed handle or modified pivot hinge (both of which require greater force to open than the broiler door on the range model involved in Michael's accident) would be safer

---

[6] In light of the serious subject matter of this lawsuit, this should not be mistaken as a pun (even a bad one).

alternatives (Hyde Rep. 9, 13). Hyde did not test any of those alternative designs with actual children, nor did he appear to conduct any research or collect any data regarding his other alternative design suggestions or regarding warnings.

Maytag cites to several Seventh Circuit cases for the proposition that a witness' failure to engage in the physical testing of suggested alternative designs precludes him from testifying about those suggestions (see, e.g., Masters, 291 F.3d at 992; Dhillon v. Crown Controls Corp., 269 F.3d 865, 870 (7th Cir. 2001)). But despite any such emphasis on the need to test alternative designs, those and other cases also consistently remind that the Daubert-Kumho reliability inquiry is a flexible one and that "no single factor, even testing, is dispositive" toward determining whether a witness' methodology is sufficiently reliable to admit his opinion testimony (Dhillon, 269 F.3d at 870; Smith, 215 F.3d at 719; see also Kumho, 526 U.S. at 150, 152). Instead of making any particular methodology the sin qua non of reliability, a court must keep its eye on the ultimate question: Do the methods used by a witness adequately guarantee that his or her findings (while not necessarily correct, a matter for the factfinder to decide at trial) are at least reliable (see Cooper v. Carl A. Nelson & Co., 211 F.3d 1008, 1020 (7th Cir. 2000))?

Indeed the central thrust of the cases on which Maytag

depends is not that testing is a prerequisite for the admissibility of alternative design suggestions, but rather that without <u>some</u> assurance of reliability--via a sound methodology such as testing--testimony cannot be presented to a jury (see, e.g., <u>Bourelle</u>, 220 F.3d at 538). For example, in <u>Masters</u>, 291 F.3d at 992 (emphasis added) the witness was prohibited from offering an opinion as to the feasibility of a product redesign because he had done "no testing <u>or research</u>." And similarly in <u>Dhillon</u>, 269 F.3d at 869 the witness could not testify to his proposed design alternatives because of a general "failure to take any steps that would show professional rigor in the assessment of the alternative designs."

What all of that makes plain is that Hyde's failure to conduct actual hands-on testing does not mandate a determination that the methodology he used to form his opinions about the safety of the range and about alternative designs that might have been safer was not reliable (<u>Cummins v. Lyle Indus.</u>, 93 F.3d 362, 369 (7th Cir. 1996)). To the contrary, this Court holds that the methodologies Hyde did employ (including performing force tests, making calculations using anthropometric data and reviewing other publicly available information about existing ranges with features similar to his suggested changes) sufficiently guarantee that certain of his opinions--those as to the safety (or lack of safety) of the original range and as to the alternative designs

of a recessed handle and a modified pivot door--are not meaningless conclusions drawn with no substantiating analysis (id.; see also Clark v. Takata Corp., 192 F.3d 750, 757 (7th Cir. 1999)).[7]

But the answer is different as to Hyde's opinions about other alternative designs and about warnings. There Maytag (at its R. Mem. 1:7) correctly argues that Dewicks have not produced any evidence of Hyde's use of a methodology that is sufficiently reliable to satisfy Daubert-Kumho. Hyde has simply not explained how he arrived at his conclusions as to any of his proposed design alternatives other than the recessed handle and modified pivot hinge (Hyde Rep. 13-14). And without his having tested the efficacy of Maytag's original warning or having drafted alternate warnings or having offered any other comparably reliable methodology, Hyde's opinions on that subject cannot be characterized as anything more than speculation or personal observation (Chapman, 297 F.3d at 688; Bourelle, 220 F.3d at 538-39).

---

[7]    Indeed, Maytag's repeated stress on the fact that the other two children were older and more developed than Michael at the time of their injuries (see the later discussion of Motion 7) displays a blind spot on the part of its counsel. If the range posed a hazard to such children that led Maytag to redesign changes that made it more difficult for them to pull down the door, Hyde could logically view the pre-change situation as to Michael as an a fortiori case for the application of his force tests and other analysis. Certainly there was no need for him to conduct like analyses as to older toddlers, for Maytag's own emphasis really concedes the issue.

Both <u>Daubert</u> and <u>Kumho</u> require this Court to be a
gatekeeper, not a roadblock (<u>Kumho</u>, 526 U.S. at 141). Faithful
to that mandate, it has reviewed the Hyde Report and his
deposition thoroughly, and it has determined:

> 1. As to (a) the original design of the range at issue
> and (b) the proposed alternative designs of a recessed
> handle or a modified pivot hinge, Hyde's methodology does
> not fall outside of the reliability boundaries demarcated by
> <u>Daubert</u>-<u>Kumho</u>. Hence his testimony on those subjects
> (including of course the inferences that his expertise
> allows him to draw from his research) is admitted.[8]

> 2. Hyde's testimony as to other alternative design
> suggestions and as to warnings is barred.

### Motion 2 (Dkt. No. 58-1)

In an earlier opinion ("<u>Dewick I</u>," 296 F.Supp. 905 (N.D.
Ill. 2003)) this Court addressed at some length whether Dewicks
could amend the Complaint under Fed. R. Civ. P. ("Rule") 15(a) to

---

[8] It is worth noting that Dewicks also attack the
methodology used by Maytag's expert to form his opinions (D.
Resp. 1:7-9). While Maytag is correct that the reliability of
its expert does not bear directly on Hyde's reliability (M. R.
Mem. 1:5), that debate over which methodology produced more
reliable results really underscores this Court's determination
that rather than cutting Dewicks off at the pass, the sounder
course of action is to admit Hyde's testimony on the subjects
where his methodology has passed muster here, allowing the
parties to engage in vigorous cross-examination at trial to hash
out which witness' approach has arguably generated more reliable
results (see <u>Cooper</u>, 211 F.3d at 1021).

include the possibility of punitive damages. That opinion, id. at 911 (while properly not resolving the question whether Dewicks could establish an entitlement to punitive damages at trial), concluded that under the lenient Rule 15(a) standards Dewicks could so amend the Complaint.

Motion 2 is thus Maytag's second pretrial attempt to stave off the possibility of punitive damages, this time by arguing that Dewicks have not presented enough (or really any) evidence to allow them to move forward with their claim for punitive damages (M. Motion 2:1). Although Maytag (per this court's request) has framed that argument as a motion in limine, what Maytag is really requesting is a judgment as a matter of law on the punitive damages claim (M. Motion 2:1 n.1).

That being so, Maytag must show (as with a Rule 56 motion) that when the evidentiary record is considered in the light most favorable to Dewicks with the benefit of all reasonable favorable inferences, no reasonable jury could return a verdict in their favor (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). There is no need to rehash the entire substance of Dewick I to see that Dewicks have come forth with sufficient evidence to create a genuine issue of material fact as to whether Maytag's conduct could justify an award of punitive damages.

12

Punitive damages are available in Illinois only where a defendant has acted in a willful and wanton manner, and not merely negligently (see, e.g., Loitz v. Remington Arms Co., 138 Ill.2d 404, 415-16, 563 N.E.2d 397, 402 (1990)). And as Dewick I, 296 F.Supp.2d at 907 details, Illinois law articulates two overarching inquiries that can be used to inform that determination:

    1.  Did defendant know that its product was defective and likely to cause injury?

    2.  Despite that knowledge, did defendant fail to take proper steps to avoid the potential for injury?

As to the first of those questions, the evidence that Maytag was aware of two substantially similar earlier incidents in which other infants were burned contributes to the permissibility of a finding that Maytag was aware of the problem with its range and of its potential to cause injuries (D. Resp. 2:14-15; Moore v. Remington Arms, 100 Ill.App.3d 1102, 1110-11, 427 N.E.2d 608, 614-15 (4th Dist. 1981)).[9] Maytag stresses that it is not enough after Loitz simply to adduce raw evidence of prior substantially similar incidents, without examining such other factors as the number of products sold and total amount of usage, as the basis for imputing knowledge to Maytag that the range was likely to

---

[9] This opinion's later discussion of Motion 7 explains why those two prior incidents are sufficiently similar to support a permissible comparison for that purpose.

cause injury (M. Motion 2:8; M. R. Mem. 2:8-10; <u>Loitz</u>, 138 Ill.2d at 419-20, 563 N.E.2d at 404). But as <u>Dewick I</u>, 296 F.Supp. at 908-09 explained in detail, later Illinois cases (see, e.g., <u>Barton v. Chicago & N.W. Transp. Co.</u>, 325 Ill.App.3d 1005, 1032, 757 N.E.2d 533, 555 (1st Dist. 2001)) have held that the conclusion in <u>Loitz</u> that a low accident ratio could bar a claim for punitive damages has been limited to situations in which the injury was related to an inherently dangerous product (or activity), while most earlier cases have held that an oven range is not traditionally categorized as an inherently dangerous product.

Maytag first tries to jump that hurdle by arguing that even if the <u>Loitz</u> focus on accident ratios is limited to inherently dangerous situations, the scenario in this case should still be included because "a range is a product that by its very nature produces extreme heat that can cause injury if someone touches the inside of it while it is in use" (M. R. Mem. 2:8). And Maytag makes the added pitch that Illinois courts have found that low accident ratios are relevant to the punitive damages issue even for products that are not inherently dangerous (M. R. Mem. 2:10).

But neither of those arguments really advances the ball for Maytag, because any determination that Dewicks may proceed with the claim for punitive damages is firmly grounded in <u>Loitz</u>--not

14

made in spite of it.  At its core Loitz, 138 Ill.2d at 419-20,
563 N.E.2d at 404 advocates a more complete exploration of the
circumstances surrounding an injury, rather than merely tallying
up prior substantially similar occurrences to reach the
conclusion that a defendant had knowledge of a particular
problem.  So even if Dewicks' evidence of prior occurrences may
not be compelling enough to get over an accident ratio threshold
and ultimately convince a jury to award punitive damages because
the infrequency of such occurrences negates the kind of
deliberate indifference (or worse) that might justify such an
award, the totality of the evidence (including the two earlier
injuries) is enough to engage the jury in the kind of holistic
evaluation envisioned by Loitz.

     Next, Dewicks have also posed a jury issue as to whether
(given what Maytag already knew about the range) it failed to
take steps necessary to avoid injury.  Evidence on that score is
in two areas:  the asserted failure to investigate and the
asserted failure to implement contemplated design changes in a
timely manner.

     As for the first of those issues, Maytag asserts at M.
Motion 2:5-6 that Dewicks have not come forward with any evidence
to refute the testimony by its Product Safety Manager Isaac
Sargunam ("Sargunam") that Maytag reviewed the design of the
broiler door and entertained the possibility of making a design

change after it became aware that two infants had been injured in connection with the broiler. That really sidesteps significant factors bearing on the adequacy of Maytag's conduct. Thus, while portions of Sargunam's deposition allude to the possibility that Maytag did investigate the incidents, other excerpts leave much to be desired as to the nature and scope of any investigation and corrective efforts (D. Resp. 2:20-21). Those conflicts in Sargunam's testimony exemplify the type of credibility assessments best reserved for resolution in a trial setting rather than via pretrial motion (see, e.g., Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1041 (7th Cir. 1993)).

Moreover, Maytag offers no support for its seeming position (M. Motion 2:6) that only a complete lack of investigation (as contrasted with a cursory or otherwise inadequate investigation) could support a claim for punitive damages. Although Dewicks' evidence may not in the end convince a jury that they are entitled to punitive damages based on the lack of quality of Maytag's investigation, that evidence is certainly sufficient to go to the jury on the punitive damages issue by casting doubt on Maytag's claim that it conducted a thorough good faith investigation (Loitz, 138 Ill. 2d at 427, 563 N.E.2d at 407).

As for Dewicks' second contention (D. Resp. 2:22-23), they urge that Maytag's failure to implement the design change that it considered before Michael's injury until it was too late to

16

prevent that injury also provides the basis for a punitive damages claim. Maytag of course disagrees, arguing both (1) that its decision to make design changes to the range did not necessarily connote the unsafeness of the original range design and (2) that in any event it does not believe that the design changes could have made (or eventually did make) the range safer so as to have prevented an injury such as Michael's (M. R. Mem. 2:9, 11).

Maytag's first point (while correct) does not dispose of the issue, because Dewicks have presented enough evidence about (at least) the nature and sufficiency of Maytag's investigation to suggest that at trial the two facts might be interrelated (D. Resp. 2:15, 16, 20, 22). And as to the second point, it is enough to say that the effectiveness of the design changes that Maytag discussed before Michael's injury and then completed after his injury is hotly contested.[10]

In sum, this Court of course reiterates that its present ruling in no way implicates a substantive decision on the propriety of punitive damages--that will be for the jury to determine. All that has been established here is that Dewicks may proceed with that aspect of their suit by presenting at trial evidence that could potentially establish the basis for a

---

[10] That subject has been addressed in the June 4 Opinion's ruling as to Motion 1, and it will be discussed further here in dealing with Motion 6.

punitive damages award.[11]

Motion 6 (Dkt. No. 62-1)

Here Maytag postulates that Rule 407 dictates that Dewicks should not be permitted to introduce evidence of any design changes Maytag made to the broiler door after Michael's accident (M. Motion 6:1-2). Rule 407 states that evidence of subsequent measures "that, if taken previously, would have made the injury or harm less likely to occur" cannot be introduced "to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction." Rule 407 specifically does not require that evidence of those measures be excluded "when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted or impeachment."

On that score Dewicks contend that evidence of the later design changes is admissible because Maytag has placed feasibility into controversy by taking the position that those changes did not render the oven safer and would not have prevented Michael's injury (D. Resp. 6:31-32). Maytag quickly counters by agreeing to "stipulate that the subsequent remedial measures at issue were feasible at the time of the Dewick accident," while still maintaining that its "alternative designs

---

[11]   This denial of Motion 2 is by definition linked to the June 4 Opinion's rulings as to Motions 3, 8 and 11.

18

would not have prevented the Dewick accident" (M. R. Mem. 6:12).
In other words, Maytag claims, it is disputing only the
effectiveness of the measures and not their feasibility (id.).

But that specious distinction constitutes an unsuccessful
effort to remove the feasibility of an earlier correction of the
claimed defect from the controverted issues category. Under the
caselaw the feasibility inquiry encompasses a whole slew of
interrelated components, including not only the question of the
possibility of correction as such but also more nuanced
considerations such as the "economy, practicality and
effectiveness" of such corrections (see Oberst v. Int'l Harvester
Co., 640 F.2d 863, 865 (7th Cir. 1980); Anderson v. Malloy, 700
F.2d 1208, 1213 (8th Cir. 1983)). Because effectiveness is thus
interlaced with feasibility as contemplated by Rule 407, Maytag's
proposed stipulation as to "feasibility" is quickly negated by
its explicit statement that it is not stipulating that those
changes would effectively have prevented Michael's injury. And
with the issue of feasibility thus remaining in play, evidence
about any later design changes that Maytag made to the range
remains admissible according to Rule 407 (Ross v. Black & Decker,
Inc., 977 F.2d 1178, 1185 (7th Cir. 1992)).

Finally, Motion 6 includes a demand that evidence of
Maytag's subsequent remedial measures not be allowed "merely to
contradict the testimony of a defense witness" (M. Motion 6:2; M.

19

R. Mem. 6:13). But such use would not run afoul of Rule 407, which by its terms allows that category of evidence to be introduced for impeachment purposes (<u>Pub. Serv. Co. of Ind., Inc. v. Bath Iron Works Corp.</u>, 773 F.2d 783, 792 (7th Cir. 1985)). To be sure, that exception must be carefully cabined so that it doesn't swallow the entire rule or offend the policy concerns underlying Rule 407 (<u>id.</u>; <u>Flaminio v. Honda Motor Co.</u>, 733 F.2d 463, 468 (7th Cir. 1984)). But all that means is that the motion in limine must be rejected, with Maytag having the opportunity to reassert its objection in the context of the actual testimony as introduced at trial.

In sum, all of Dewicks' evidence about the design changes Maytag made after Michael's accident is admissible on the grounds stated here (unless, of course, barred at a later time on some other ground). Motion 6 is denied.[12]

Motion 7 (Dkt. No. 63-1)

M. Motion 7:1 opposes Dewicks' introduction into evidence of prior accidents involving the same range "for the purpose of permitting the jury to draw an inference as to the harmful

---

[12]  D. Resp. 6:32 also alludes to the admissibility of evidence about Maytag's consideration of potential design modifications before Michael was injured. Maytag's Motion 6 did not seek to exclude that evidence--rightfully so, given this Court's earlier ruling (<u>Dewick I</u>, 296 F.Supp.2d at 910-11) that such evidence is outside the scope of Rule 407 entirely and (absent another ground for inadmissibility) is fair game at trial.

tendency or capacity of the subject oven range." But D. Resp. 7:33-34 makes clear that such evidence is proffered only to show that those prior incidents put Maytag on notice of a defect and that the likelihood of injury from that defect was foreseeable.

Earlier accidents that occurred under circumstances substantially similar to those that led to plaintiff's accident are relevant to whether a defendant had notice of a particular defect or danger, so such earlier occurrences are usually admissible under Rule 402 (Mihailovich v. Laatsch, 359 F.3d 892, 908 (7th Cir. 2004)).[13] Maytag seeks to avoid the impact of that principle by urging that the other two incidents that Dewicks seek to admit (the Drozd and Garland claims) did not occur under circumstances substantially similar to those of Michael's injury.

In that respect Maytag first notes that both of the other children were older than Michael and urges that the age differential and corresponding developmental differences preclude a finding of substantial similarity (M. Motion 7:2; M. R. Mem. 7:14). And Maytag also asserts that because the Dewicks do not know exactly how Michael opened the broiler door, the Drozd and Garland claims cannot be substantially similar with respect to

---

[13] Both parties consistently cite to Illinois law as to the admissibility of prior accidents to show notice. But all of those references are inconsequential, given the maxim that a federal court sitting in diversity looks to federal law to decide evidentiary issues such as this one (Klonowski v. Int'l Armament Corp., 17 F.3d 992, 995 (7th Cir. 1994)).

the mechanism of how the door was opened (regardless of how the other two children did in fact open the door) (M. Motion 7:2; M. R. Mem. 7:13).

But those arguments fail to create an outright bar because "substantially similar" does not equate to "identical"--that is, properly comparable incidents need not be carbon copies of Michael's accident to warrant admissibility (Mihailovich, 359 F.3d at 908). Moreover, the foundational requirement of substantial similarity is relaxed even further when prior accidents are introduced only to show that a defendant had notice of a condition and not as substantive evidence that the presence of the condition created liability (Nachtsheim v. Beech Aircraft Corp., 847 F.2d 1261, 1269 n.9 (7th Cir. 1988)).

Indeed, Mihailovich, 359 F.3d at 908 has recently reminded that it is the defect or danger alleged by a plaintiff that defines the degree of commonality required to find incidents substantially similar. In this case the asserted danger is simply that an infant could inadvertently open the broiler door of the particular model of Maytag range, regardless of the exact mechanism used or the precise age of the child (see Ross, 977 F.2d at 1185). So Dewicks are correct in contending (at least for purposes of determining substantial similarity as it relates to notice) that any possible differences as to how the children opened the broiler door and any slight developmental variations

across the age span of the three infants (just five months) are "distinction[s] without a difference" (D. Resp. 7:33).[14]

Maytag is also wrong in arguing that some claimed evidentiary gaps, such as Dewicks' inability to allege precisely how Michael opened the broiler door or the fact that Hyde focused only on the developmental capabilities of a ten month old (and not a child two or five months older), destroy the admissibility of the other accidents (M. Motion 7:2-3; M. R. Mem. 7:13-14). Instead such evidence will be admitted at trial, with Maytag of course free to point to any claimed dissimilarities between the incidents (caused either by asserted evidentiary holes or by the degree to which the incidents are not identical)(Mihailovich, 359 F.3d at 908-09).

Again by way of summary, evidence as to the Drozd and Garland claims is admissible for the limited purpose of assertedly showing that the injuries were foreseeable because Maytag had notice of the range's propensity for injuring young children. That evidence may not, however, be used to demonstrate the alleged harmfulness of the range.[15]

---

[14] Again the blind spot of Maytag's counsel (see n.7) manifests itself here. It is of course totally irrelevant to the viability of Hyde's opinions as to Michael that Hyde did not analyze whether design changes would prevent older children from opening the broiler door, as M. R. Mem. 14 seeks to emphasize.

[15] Maytag has not invoked any of the concerns contemplated by Rule 403 that could cut against admissibility. But this Court reserves the possibility, as the trial unfolds, not only to give

## Conclusion

This opinion has granted Maytag's Motion 1 in part and denied it in part, denied Motions 2 and 6 and granted Motion 7 for the limited purpose it seeks to advance. With all the parties' motions in limine now having been dispatched, counsel for the parties are directed to transmit letters to this Court on or before July 20, 2004, with copies to opposing counsel, identifying their respective unavailabilities for trial (taking witness unavailabilities into account) between August 16 and November 30, 2004. This Court will then set the case for trial.

_____
Milton I. Shadur
Senior United States District Judge

Date: July 6, 2004

---

the appropriate cautionary instructions as to the jury's use of testimony regarding the Drozd and Garland incidents, but also to engage in appropriate Rule 403 balancing in that respect (Mihailovich, 359 F.3d at 913).